UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAE INDUSTRIES, INC.

   Plaintiff,

v.                    Civil Case No. 22-12134
                  Honorable Linda V. Parker

AGRATI – MEDINA, LLC, and
AGRATI – TIFFIN, LLC

   Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 5)

**I.    Introduction**

This is a diversity action arising from Defendants' demand of a price increase to specialty manufactured auto parts (steel-based rivets, bushings, and main pivots). Plaintiff needs to produce automotive parts for Tier-1 customers, who then incorporate Plaintiff's components into car seats, which are shipped to original equipment manufacturers. On September 9, 2022, Plaintiff BAE Industries, Inc., filed this lawsuit against Defendants Agrati -Medina, LLC and Agrati-Tiffin, LLC (hereafter "Agrati"). (ECF No. 1.) Plaintiff alleges the following claims against Agrati: (I) breach of contract/specific performance, (II)

declaratory judgment, and (III) repudiation of a requirements contract. (ECF No. 1 ¶¶ 81-99, Pg ID 15-17.)

Presently before the Court is Plaintiff's Emergency Motion for Entry of a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, or In the Alternative, An Expedited Preliminary Hearing, and Brief in Support filed on September 9, 2022. (ECF No. 5.) The motion has been fully briefed (ECF Nos. 10, 12) and the Court held a motion hearing on September 19, 2022 during which both parties participated in oral argument. For the reasons that follow, the Court grants the motion and enters a preliminary injunction.

## II.   Background

According to Plaintiff, Agrati supplies Plaintiff with specialty automotive parts, including Steel-based rivets, bushings, and main pivots. (ECF No. 1 at Pg ID 4.) Plaintiff uses the specialty parts to manufacture and supply auto part components to Tier-1 customers, who incorporate the components into car seats, then ship to the original equipment manufacturers, Stellantis and GM ("OEMs"). (*Id.* ¶¶ 15-16.) Finally, the OEMs incorporate the car seats into their DT and T1XX vehicle programs, respectively. (*Id.* ¶¶ 17-18.) Agrati is Plaintiff's only supplier for the specialty parts, Plaintiff is the sole supplier for the Tier-1

manufacturers, and the Tier-1 manufacturers are the sole suppliers for the OEMs. (*Id*.)

Plaintiff alleges that the parties entered into a long-term fixed-price requirements contracts for the supply of the specialty parts due to the terms in the Purchase Orders. (Compl. Ex. 1, ECF No. 1 ¶ 1 at Pg ID 1.) Under the agreement, Agrati agrees to supply all of Plaintiff's requirements. (*Id*. ¶ 35, Pg ID 7.) Pursuant to Plaintiff's Terms and Conditions ("T&Cs"), Agrati accepted to be bound by the agreement by manufacturing and shipping the materials in response to Plaintiff's purchase orders. (*Id*. ECF No. 1-3 at Pg ID 38.) These terms included Agrati's obligation to supply Plaintiff's requirements for the duration of the OEMs' program production life.[1] (*Id*. § I(B), Pg ID 38.) Also included are the requirements of timely delivery of all materials Plaintiff orders. (*Id*. § II(B); ECF 1 ¶ 35, Pg ID 7.)

---

[1] Paragraph I(B) of Plaintiff's Terms reads:

> Subject to Purchaser's termination rights as set forth herein, the agreement formed by this Purchase Order is binding on the parties for the length of the applicable Purchaser's customer's vehicle program production life (including model refreshes as determined by such customer), provided that the Goods and/or Services are incorporated, either directly or indirectly, into such customer's vehicles.

(Compl. Ex. 2, ECF No. 1-3 at Pg ID 76.)

3

Between 2020 and 2022, the price of steel—which is used to produce Plaintiff's specialty parts—began to rise. (ECF No. 10 at Pg ID 335.) In Spring of 2020, the COVID-19 pandemic caused lockdowns, the closing of steel mills, and U.S. Border restrictions. (*Id.* at Pg ID 335, 345.) The increased price of steel was further exacerbated by the Russian-Ukraine war, lockdowns in China, and inflation. (*Id.* at Pg ID 335.) As a result of Agrati's alleged cost increase of 11.7 percent, Agrati sought price increases for its specialty parts sold to Plaintiff in July of 2021. (*Id.*) In response, Plaintiff directed Agrati to the T&Cs of the parties' agreement, including the fixed-price requirements. (ECF No. 1 ¶ 39, Pg ID 8.) After the initial communication, the parties did not communicate again about the pricing for months. (*Id.*)

On December 7, 2021, Agrati sent a letter indicating anticipation of higher costs for steel in 2022 and that as a result, it would be increasing prices for specialty parts beginning the first of the year. (*Id.*; see Compl. Ex. 3) Again, Plainitff directed Agrati to Plaintiff's T&C and notified Agrati that Plaintiff does not update prices in its contracts as a result of fluctuations in the market. (*Id.*) Agrati then responded that it successfully obtained price increases from the majority of its other customers. (*Id.*)

On May 22, 2022, Plaintiff requested that Agrati provide financial statements to support the need for increased prices. (*Id.*) On June 14, 2022, Agrati

4

sent a letter demanding the price increase and stated that if Plaintiff did not agree to pay the higher prices by June 30, 2022, Agrati would refuse to ship the specialty parts beginning July 1, 2022. (ECF No. 5 at Pg ID 128). On June 17, 2022, Agrati sent an e-mail refusing to provide the requested financial statements, and in response, Plaintiff sent a letter the same day seeking adequate assurance of continued performance under Michigan Compiled Laws § 440.2609. (ECF No. 5 at Pg ID 129.) On June 23, 2022, Agrati requested that parties seek mediation, which occurred on July 18, 2022 but was unsuccessful in resolving the matter. (*Id.*)

On August 30, 2022, Agrati sent a final letter to Plaintiff demanding price increases stating that Agrati would cease any further shipments beginning on September 1, 2022. (ECF No. 5 at Pg ID 129.) On September 1, 2022, Plaintiff sent a revised purchase order under protest at the increased price that Agrati demanded. (*Id.* at Pg ID 130; *see also* Mot. Ex. 11, ECF No. 5-12.) However, Agrati rejected the proposal to pay the higher pricing under protest and requested that Plaintiff also issue purchase orders retroactively dating back to January 1, 2022, which would include the increased price. (*Id.*; *see also* Mot. Ex. 14, ECF No. 5-14.) This retroactive pricing is estimated to be approximately $188,000. (*Id.*) Plaintiff refused to pay the retroactive payment and as a result, Agrati ceased all shipments of specialty parts. (*Id.*)

5

Maintaining that it will run out of the materials needed to produce parts for its customers on or about September 16, 2022[2] (*id.* at Pg ID 131), Plaintiff filed this lawsuit and motion for injunctive relief.

### III. Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 grants district courts the power to issue an *ex parte* temporary restraining order to maintain the status quo until the court has the opportunity to hold a hearing and decide whether a preliminary injunction should issue. *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974)). However, the Sixth Circuit determined that "a hearing is *only* required when there are disputed factual issues,[3] and not when the issues are primarily questions of law." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) (emphasis added); *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019). In other words, "[w]here the resolution of the questions to be considered in issuing a preliminary injunction turns on legal rather

---

[2] At the Court's request during the Telephone Status Conference held on September 12, 2022, Agrati agreed to make an additional shipment to Plaintiff on September 14, 2022 to provide the Court time to rule on the motion.

[3] In the Motion Hearing on September 19, 2022, Agrati stated that there were concerns about whether the record before the Court was complete. However, Agrati had approximately 14 months (from the time that Agrati initially disputed the prices) to gather the necessary documents to prove that the record was incomplete, yet Agrati has not provided the Court with any substantial evidence to the contrary.

6

than factual conclusions, the taking or oral testimony by both sides is not a prerequisite to a fair hearing." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 553 (citing *S.E.C. v. G. Weeks Sec., Inc.,* 678 F.2d 649, 651 (6th Cir.1982)). In reaching this conclusion, the Sixth Circuit adopted the following language from the Eleventh Circuit:

> [W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. [However,] where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.

*Id.* (citing *McDonald's Corp. v. Robertson* 147 F.3d 1301, 1312–13 (11th Cir.1998).

A court must balance four criteria in deciding whether to issue a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)) (brackets omitted). "A preliminary injunction is an extraordinary remedy which should be

granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.*

Although the court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000). Thus, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive. *In re DeLoreon Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## IV. Applicable Law & Analysis

### A. Plaintiff's Likelihood of Success on the Merits

Under Michigan Law, the party asserting breach of contract must demonstrate, by a preponderance of the evidence, that: (1) there was a contract between the parties, (2) a breach of its terms by the other party, and (3) damages resulting to the party claiming the breach. *See Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).

An anticipatory breach of contract occurs where, prior to the time for performance, a party to a contract unequivocally declares the intention not to perform. *See Stoddard v. Mfrs. Nat'l Bank of Grand Rapids*, 593 N.W.2d 630, 640 (Mich. Ct. App. 1999). In that instance, the other party has the option of either suing immediately for the breach or waiting until the time of performance. *Id.* "In

determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Paul v. Bogle*, 484 N.W.2d 728, 735 (Mich. Ct. App. 1992). "[A] party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Id*. at 735 (quoting Restatement (Second) of Contracts § 250 (1981)).

### 1. Requirements Contract and Breach

Plaintiff maintains that the Purchase Orders attached to its Complaint (Ex. 1, ECF No. 1,) together with Plaintiff's T&Cs being incorporated on the face of the Purchase Orders constitute a valid, binding, and enforceable contract, which required Agrati to supply specialty auto parts to Plaintiff at the agreed-upon price, for the quantities specified by Plaintiff, for the life of the designated programs.[4] *See* Mich. Comp. Laws § 440.2204(1).[5] Agrati accepted the terms by supplying

---

[4] The programs in question, the DT and T1XX vehicle programs, did not go into production until 2018, for the 2019 models. Agrati asserts that the older pricing from 2012-2014 does not apply to the current programs and should not be carried over to the current purchase orders since Plaintiff "did not specify the program for which the purchase orders were issued." (ECF No. 10 at Pg ID 333.) However, since Agrati continued to ship at the agreed upon price without due diligence to ensure the contracts were up to date, that argument fails due to the likelihood of a new agreement being established at the point of shipment.

[5] Section 440.2204(1) states: "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

materials to Plaintiff, *see id*. § 440.2206,[6] and if the Court determines that a requirements contract exists, Agrati would have breached by failing to deliver parts to Plaintiff on September 7, 2022, in the quantities specified.

Additionally, it is likely that Agrati would be found to have anticipatorily breached the agreement by threatening to cease shipment unless Plaintiff agrees to pay prices higher than those in the agreement and retroactive prices that were not originally agreed upon. *See Dayco Prods, LLC v. Thistle Molded Grp, LLC*, No. 2019 WL 423523, at *6 (E.D. Mich. Feb. 4, 2019) (finding an anticipatory repudiation based on the seller informing the buyer that the seller was unwilling to deliver at the contract price). However, Agrati argues that there was no requirements contract citing Mich. Comp. Laws § 440.2306(1),[7] asserting that the

---

[6] Section 440.2206 provides:

> "(1) Unless otherwise unambiguously indicated by the language or circumstances . . . (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods. . . ."

[7] Section 440.2306(1) provides that:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any

(Cont'd . . .)

10

lack of a specified quantity is cause for a failed creation of the contract. (Resp. ECF No. 10, at Pg ID 342.) However, this District has already determined that no quantity is necessary to create a requirements contract. *See Dayco Prods,* 2019 WL 423523 at *1 (enforcing requirements contract without percentage stating "the quantity is for Purchaser's requirements"). While there does not appear to be signed agreements between the parties, Plaintiff maintains that this contractual requirement is satisfied because the parties had the intent to enter into the agreement. *See MSCC, Inc. v. Airboss Flexible Prods Co.*, -- N.W.2d --, 2021 WL 3233601, at *5 (Mich. Ct. App. July 29, 2021) (citing Mich. Comp. Laws § 440.2201) (holding "defendant's argument that the purchase order was not enforceable against defendant because it was not signed [was] without merit" because defendant did not object within 10 days after receiving written confirmation). Agrati's argument that no requirements contract was formed would likely fail as a matter of law.

    **2.    Contract Terms**

To the extent Agrati maintains that their terms, and not Plaintiff's T&Cs control, this District has already rejected a similar argument. *See, e.g., Dayco Prods.*, No. 2019 WL 423523, at *5-6 (rejecting seller's argument that its invoices

---

normal or otherwise comparable prior output or requirements may be tendered or demanded.

11

established the terms of the contract as the buyer's purchase orders clearly stated that acceptance could be made by commencing work or shipping the parts and, by doing so, the seller accepted the purchase order's terms). Agrati argues that by Plaintiff agreeing to do business with it, Plaintiff is subject to Agrati's terms.[8] (ECF No. 10 at Pg ID 340-41.) However, the language in the Purchase Orders confirming the application of Plaintiff's T&Cs to the agreement are clear: "[t]his purchase order is governed by the BAE Supplier Manual and BAE Terms & Conditions for Requirements Contract which can be found on the BAE website." (Mot. Ex. 2, ECF No. 5-3 at Pg ID 173.) Further, Plaintiff's T&Cs state that " [e]ach Purchase Order shall be deemed accepted on the terms and conditions of such Purchase Order . . . by Seller, by either shipment of Goods, performance of Services . . . or any other conduct of Seller that recognizes the existence of a contract . . . ." (Compl. Ex. 2, ECF No. 1-3 ¶180, Pg ID 180.)

---

[8] Agrati's Terms and Conditions state the following:

> "These general terms and conditions apply to, whether written or oral, all proposals and quotations submitted by Seller, to all purchase orders received by Seller, and to all Goods and services sold and/or provided by Seller (collectively, "Goods"), except as otherwise specifically provided in a document signed by Seller . . . ."

(Resp. Ex. 1, ECF No. 10-3 Pg ID 363.)

### 3. Impracticability Defense

Agrati argues that even if a requirements contract did exist, it should be excused because of the 11.7 percent rise in the cost of steel due to the COVID-19 pandemic and the War in Ukraine, making performance impracticable. (ECF No. 10 at Pg ID 344-47.) Under Michigan Law, a seller can raise the impracticability defense to a contract. *See* Mich. Comp. Laws § 440.2615(a).[9] However, courts, including the U.S. Supreme Court, conclude that an unprofitable contract and increase in the cost of raw materials does not rise to the level of impracticability. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 768 n.12 (1983) ("[e]conomic necessity is not recognized as a commercial impracticability defense to a breach of contract claim."); *see also Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 703 (6th Cir. 2017) (applying Michigan law) ("the simple fact that a contract has become unprofitable for one of the parties is generally insufficient to establish impracticability . . . [and] [t]his is

---

[9] Section 2615(a) provides in relevant part:

> Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

13

especially true when the parties have entered into a contract for the sale of goods at fixed prices because such contracts are made for the very purpose of establishing a stable price despite a fluctuating market."); *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 149 n.34 (6th Cir.1983) ("Increases in the cost of production, however, do not, absent more, support a claim of commercial impracticability.").

Agrati argues that Official Comment 4 to Section 440.2615 provides support as to excuse them from the agreement. (ECF No. 10 at Pg. ID 345.) Comment 4 provides the following:

> "Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance . . . But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section."

Mich. Comp. Laws. § 440.2615 cmt. 4. However, Plaintiff's force majeure clause in its T&Cs contemplated that "changes in cost or components will not constitute a force majeure event," even if it is due to "wars and other natural disasters," unless the other party notifies Plaintiff within 10 days after the force majeure event occurs. (Mot. Ex. 3, ECF 5-4 ¶ XVIII., Pg ID 48.) Under Michigan law, whether a force majeure event has occurred depends on the parties' contract and the intent of the parties expressed therein. *See Kyocera Corp. v. Hemlock Semiconductor, LLC*,

14

886 N.W.2d 445, 451 (Mich. Ct. App. 2015). Force majeure clauses are narrowly construed, and apply only "if the event that caused the part's non-performance is specifically identified." Agrati maintains that a qualifying event occurred, yet nothing on the record reflects the date of when the event occurred or whether Agrati contacted Plaintiffs within 10 days of a qualifying event, which is required under Plaintiff's T&Cs.

### B.   Irreparable Harm

"An injury is irreparable if the harm is difficult to calculate." *RECO Equip., Inc. v. Jeffrey S. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021). A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). "For an injury to constitute irreparable harm, it must also 'be certain, great, and actual.'" *Cooper-Standard Auto. Inc.*, 568 F. Supp. 3d at 848 (quoting *Lucero v. Detroit Public Schools*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001). "[L]oss of customer goodwill" and damage to "competitive position" are harms that are difficult to calculate. *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2016). A risk to the plaintiff's reputation also threatens irreparable harm. *See Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 654 (E.D. Mich. 2020) (citation omitted).

15

Plaintiff argues that the unique nature of the automotive supply chain makes irreparable harm inevitable where a shutdown results from a supplier's refusal to deliver component parts. As Judge Edmunds found in *Cooper-Standard*: "The 'just-in-time' nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract." *Cooper-Standard Auto. Inc.*, 568 F. Supp. 3d at 848 (citing *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2021) (finding that "the potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court"). Plaintiff maintains that Agrati's failure to meet its obligations under their agreement will impair Plaintiff's ability to provide components to its OEM customers and, in turn, their ability to continue vehicle production. Additionally, Plaintiff maintains that it will suffer "incalculable" reputational harm and it will likely lose goodwill. (ECF No. 1 at Pg ID 2.)

Agrati argues that Plaintiff can "cover" to avoid the irreparable harm by either (1) paying the increased prices and retroactive amount of $188,000, or (2) passing the costs of the price increases to Plaintiff's customers. (ECF No. 10 at Pg ID 350-52.) However, in *Cooper-Standard,* this District rejected the exact same argument that "[the buyer] controls its own fate and can choose to pay the

increased prices or suffer the damages it describes." *Cooper-Standard Auto. Inc.*, 568 F. Supp. at 848. Further, the court noted that "while a buyer may have the responsibility to 'cover' in order to lessen its damages, . . . this typically refers to a buyer's ability to procure similar goods from a different distributor." *Id.* (quoting Mich. Comp. Laws § 440.2715(2)) (noting that the "unique nature of [seller's] products and the testing and certification requirements of [buyer's]customers, it would not be possible to secure alternate products from a different supplier."); *see also TRW, Inc. v. Indus. Sys. Associates, Inc.*, 47 Fed. App'x 400, 401 (6th Cir. 2002) (agreeing with the Magistrate Judge that a preliminary injunction was proper where "[a]utomakers could not readily obtain air bags from a second source if [plaintiff] were to fail to supply them."). Plaintiff maintains that Agrati's parts are unique and not available on the open market, which would take Plaintiff six to eight months to gain an alternative supplier. (ECF No. 1 ¶ 25, Pg ID 6.) Thus, cover would not be possible.

    C.    **Balancing of Harms**

Agrati maintains that an injunction will not irreparably harm Plaintiff as long as Plaintiff agrees to pay the retroactive payments. However, as the Court discussed, this District dispelled that argument in *Cooper-Standard*. If Agrati prevails in this action, Plaintiff can be required to pay the increased price and the

retroactive payments demanded. On the other hand, the OEMs will be harmed without injunctive relief.

### D. Public Interest

This District has concluded that a disruption to the automotive supply chain will harm the public's interest. *Cooper-Standard*, 568 F. Supp.3d. at 848 (citing *Key Safety Sys., Inc. v. Invista, S.A.R.L., LLC*, No. 08-10558, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008); *Almetals Inc. v. Wickeder Westfalenstahl, GmbH*, No. 08-10109, 2008 WL 4791377, at *10 (E.D. Mich. Oct. 29, 2008). Further, if the Court does find that a contract existed, "the public interest lies in preserving the enforceability of contracts." *Neveux v. Webcraft Techs., Inc.*, 921 F. Supp. 1568, 1573 (E.D. Mich. 1996).

The Court finds that Plaintiff will likely prevail on the merits of its claims based on U.S. Supreme Court and Sixth Circuit precedent. Further, if there is an objection to the Court granting a Preliminary Injunction in lieu of a Temporary Restraining Order, the objecting party may submit briefing as to why it is opposed.

### V. Conclusion

For the above reasons, the Court grants Plaintiff's request for preliminary injunction.

Accordingly,

**IT IS ORDERED**, that Plaintiff's motion for preliminary injunction (ECF No. 5) is **GRANTED**.

**IT IS FURTHER ORDERED**, that Plaintiff shall post an undertaking within five (5) business days of the entry of this Order with the Clerk of the Court in the form of a bond, cash, or check in the sum of $10,000 as security for the payment of such costs and damages as may be incurred or suffered by any party as a result of a wrongful restraint hereunder.

**IT IS SO ORDERED.**

s/ Linda V. Parker<br>
LINDA V. PARKER<br>
U.S. DISTRICT JUDGE

Dated: September 20, 2022